UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

UNITED STATES OF AMERICA )
)                No. 2:24-CR-19
v. )
)                JUDGE CORKER
STEPHEN O. ANAGOR )

## PLEA AGREEMENT

The United States of America, by the United States Attorney for the Eastern District of

Tennessee, and the defendant, Stephen O. Anagor, and the defendant's attorney, Charles L. Bledsoe,

Esquire, have agreed upon the following:

1.      The defendant will plead guilty to the following counts in the superseding

indictment:

a)      Count Two. This count charges the defendant with conspiracy to commit

mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, and 1349. The maximum punishment

for this offense is a term of imprisonment of up to 20 years, a fine of up to $250,000 or twice the

gross loss or twice the gross gain from the offense, whichever is greater, a term of supervised

release of up to three years, and a mandatory assessment of $100.

b)      Count Four. This count charges the defendant with aggravated stalking

resulting in death under an aiding and abetting theory and a *Pinkerton* theory, that is, the defendant

aided and abetted another coconspirator who engaged in the aggravated stalking of another person

that resulted in that other person's death in violation of 18 U.S.C. §§ 2261A(2)(B), 2261(b)(1), 2,

and *Pinkerton v. United States*, 328 U.S. 640 (1946). The maximum punishment for this offense is

any term of imprisonment up to life, a fine of up to $250,000 or twice the gross loss or twice the

$\int \Lambda$

gross gain from the offense, whichever is greater, a term of supervised release of up to five years, and a mandatory assessment of $100.

        c)     Count Thirty-Six. This count charges the defendant with aiding and abetting aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1) and 2 and *Pinkerton v. United States*, 328 U.S. 640 (1946). The maximum punishment for this offense is a mandatory, consecutive term of imprisonment of two years, a fine of up to $250,000 or twice the gross loss or gross gain from the offense, whichever is greater, a term of supervised release of up to one year, and a mandatory assessment of $100.

        2.     In consideration of the defendant's guilty pleas, the United States agrees to move the Court at the time of sentencing to dismiss the remaining counts against the defendant in the superseding indictment. The United States also agrees not to further prosecute the defendant in the Eastern District of Tennessee for any other non-tax criminal offenses committed by the defendant that are related to the charges contained in the superseding indictment in this case and that are known to the United States Attorney's Office for the Eastern District of Tennessee at the time this plea agreement is signed by both parties.

        3.     The defendant has read the superseding indictment, discussed the charges and possible defenses with defense counsel, and understands the crimes charged. Specifically, the elements of the offenses are as follows:

        a)     For the offense of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, and 1349, the elements of the offense are the following: (1) two or more persons conspired, or agreed, to commit any crime of mail or wire fraud; and (2) the defendant knowingly and voluntarily joined the conspiracy.

2

b)      For the offense of aggravated stalking resulting in death in violation of 18 U.S.C. §§ 2261A(2)(B) and 2261(b)(1), the elements of this offense are the following: (1) a person, with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person; (2) used the mail or any facility of interstate or foreign commerce to engage in a course of conduct that (a) placed the other person in reasonable fear of death of or serious bodily injury to that person, an immediate family member, or a spouse or intimate partner or (b) caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress to that person, an immediate family member, or a spouse or intimate partner.; and (3) the death of that person resulted. To be guilty of aiding and abetting this offense under 18 U.S.C. § 2, the elements are the following: (1) the crime of aggravated stalking in violation of 18 U.S.C. § 2261A was committed; (2) the defendant helped to commit the crime or encouraged someone else to commit the crime; and (3) the defendant intended to help commit or encourage the crime. To be guilty of this offense under *Pinkerton* liability, the elements are the following: (1) the defendant was a member of a conspiracy; (2) after the defendant joined the conspiracy, and while the defendant was still a member of it, one or more of the other members of the conspiracy committed the crime of aggravated stalking in violation of 18 U.S.C. § 2261A; (3) this crime was committed to help advance the conspiracy; and (4) this crime was within the reasonably foreseeable scope of the unlawful project.

c)      For the offense of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1) the elements are the following: (1) a person committed the felony violation of mail or wire fraud as charged in the superseding indictment; (2) a person knowingly transferred, possessed, or used a means of identification of another person without lawful authority; (3) the person knew the means of identification belonged to another person; and (4) the transfer, possession, or use was

3

during and in relation to the mail or wire fraud. To be guilty of aiding and abetting this offense under 18 U.S.C. § 2, the elements are the following: (1) the crime of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1) was committed; (2) the defendant helped to commit the crime or encouraged someone else to commit the crime; and (3) the defendant intended to help commit or encourage the crime. To be guilty of this offense under *Pinkerton* liability, the elements are the following: (1) the defendant was a member of a conspiracy; (2) after the defendant joined the conspiracy, and while the defendant was still a member of it, one or more of the other members of the conspiracy committed the crime of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1); (3) this crime was committed to help advance the conspiracy; and (4) this crime was within the reasonably foreseeable scope of the unlawful project.

4. In support of the defendant's guilty plea, the defendant agrees and stipulates to the following facts, which satisfy the offense elements. These are the facts submitted for purposes of the defendant's guilty plea. They do not necessarily constitute all of the facts in the case. Other facts may be relevant to sentencing. Both the defendant and the United States retain the right to present additional facts to the Court to ensure a fair and appropriate sentence in this case.

### *General Background*

a) The defendant, originally a citizen of Nigeria, is a naturalized United States citizen. Chinagorom Onwumere ("Onwumere"), originally a citizen of Nigeria, is a naturalized United States citizen. Onwumere's spouse, Salma Abdalkareem ("Abdalkareem"), is originally from Sudan and, at all relevant times, was in the United States on a visa.

b) At all relevant times, defendant was a member of the United States Army, and Onwumere was a member of the New Jersey National Guard. As part of their military training, each participated in basic training at Fort Jackson in Columbia, South Carolina. While there, defendant

4

*S·A*

met Onwumere. Defendant and Onwumere quickly realized they both were from Nigeria and became friends. Through this friendship, defendant advised Onwumere that he had a way that Onwumere and Abdalkareem could make money by working with Coconspirator 1, defendant's relative in Nigeria. Defendant explained to Onwumere that Coconspirator 1 made people "fall in love" on the computer and obtained money from them. Coconspirator 1 needed individuals with bank accounts in the United States where the victims of the scheme could send money for subsequent transfer to other members of the conspiracy. Onwumere agreed that he and his wife would join the conspiracy by permitting defendant and his relative to launder funds through their bank accounts.

        c)      Onwumere and Abdalkareem owned or controlled various bank accounts with financial institutions in the United States. These included a joint personal checking account ending in 5723 with Navy Federal Credit Union ("the NFCU account"), a personal checking account ending in 9842 held individually by Abdalkareem with Wells Fargo ("the Wells Fargo account"), and a business checking account ending in 3104 in the name Salmasam, LLC with TD Bank ("the TD Bank account"). Salmasam, LLC was a New Jersey LLC that Onwumere and Abdalkareem had formed and owned. Defendant also had a personal bank account in the United States—a checking account with Armed Forces Bank with an account number ending in 2128 ("the Armed Forces Bank account"). All these accounts were used to deposit funds obtained during and as a result of offenses committed during the conspiracy.

        d)      A "romance scam" is a type of fraud in which scammers use fictitious social media accounts, fictitious text messaging accounts, and sham email accounts to impersonate others. Scammers use these phony accounts to impersonate people, sometimes famous people and sometimes just made-up persons. Often, scammers pretend to be well-known celebrities and

5

pretend to have romantic interests in victims to gain the trust and confidence of victims. At other times, a scammer will pretend to be a non-celebrity person with a romantic interest in a victim. In the end, scammers then exploit the trust they develop to con and defraud victims out of money and other property.

e)      Other than his knowledge that Coconspirator 1, his relative, was defrauding people in the United States through romance scams, defendant did not know the day-to-day specifics of how and when Coconspirator 1 and others were communicating with victims, just that the funds they were receiving derived from that activity. On occasion, defendant would also assist Coconspirator 1 by placing orders for flowers, gifts, and chocolate with Amazon and other vendors to be delivered to victims of the romance scams that Coconspirator 1 was orchestrating. Once defendant, Onwumere, and Abdalkareem obtained funds from the scheme, they would keep some of the proceeds and would make electronic transfers of other funds to accounts and individuals, usually individuals who Coconspirator 1 directed.

### *The Romance Scam Perpetrated on Victim 1*

f)      Victim 1 was a retired secondary school teacher who lived in Jonesborough, Tennessee. Victim 1 became ensnared with members of the conspiracy, including Coconspirator 1 and others in Nigeria, after he encountered a Facebook page with an association to Celebrity 1, a well-known female actor. Victim 1 thought he was communicating with Celebrity 1 throughout the scheme. In truth, Victim 1 was communicating with coconspirators in Nigeria.

g)      Victim 1's initial contact with the person he thought was Celebrity 1 took place on or about August 12, 2023. No evidence suggests that defendant was involved in direct communications with Victim 1.

6

$\mathcal{S} \cdot A$

h) Between August 12, 2023, and October 23, 2023, Victim 1 communicated by Google chat with one or more members of the conspiracy located in Nigeria who were impersonating Celebrity 1. All messages exchanged between Victim 1 and conspirators purporting to be Celebrity 1 involved interstate or foreign wire communications between Tennessee and persons in Nigeria. The exchanged messages typically were romantic in nature and created the false pretense that Celebrity 1 was romantically attracted to, and interested in, having a long-term, intimate relationship with Victim 1—perhaps even getting married.

i) During the initial ramp-up, Victim 1 questioned whether he was speaking with the real Celebrity 1 because there were so many fan pages for Celebrity 1 on social media. In response, on August 15, 2024, a conspirator requested Victim 1 to take a screenshot of the page he was referencing, and stated, "I will have to give these to my team of FBI." The impersonator continued, "I just told my team of FBI." The pretend relationship with the FBI would ultimately lead to a law-enforcement scam.

j) By August 17, 2023, members of the conspiracy had convinced Victim 1 to purchase a gift card to facilitate more revealing communications between him and Celebrity 1. At a coconspirator's direction, Victim 1 purchased a Vanilla Visa card from Walgreens in the amount of $400 and sent digital photographs of the card to a member of the conspiracy in Nigeria who then activated the card.

k) After Victim 1 sent the initial $400 gift card, conspirators in Nigeria then attempted to get Victim 1 to purchase a special membership card that would permit him to engage in direct computer activity with Celebrity 1. In one message on August 24, 2023, a conspirator advised, "if you get the gift card [sic] I ask you now am going to send you one of my naked pics." Victim 1 declined to send anymore gift cards.

7

l)      On August 21, 2023, a conspirator in Nigeria sent Victim 1 a revealing photo purporting to be Celebrity 1. A follow-up message stated, "I don't do this for any folks [sic] please delete please hun [sic] I don't want to let myself down on this again."

m)      Members of the conspiracy in Nigeria continued to con Victim 1 into believing he was in a romantic relationship with Celebrity 1. By October 6, 2023, a conspirator in Nigeria even messaged, "How about you file a divorce? Get a divorce and I'll share 30% of my wealth with you as my spouse."

### *The Law Enforcement Scam*

n)      After conspirators sent Victim 1 purported nude images of Celebrity 1, an elaborate law enforcement scam then took place. During this phase of the con, conspirators in Nigeria impersonated high-level federal law enforcement officials, including the Director of the FBI and the Attorney General of the United States. The gist of the scam was that Celebrity 1's management team had reported the unauthorized leak of Celebrity 1's revealing images to the public, and Victim 1 was the prime suspect. The imposter officials then repeatedly harassed and intimidated Victim 1 with threats of criminal action and public humiliation if he did not pay a series of fines.

o)      Victim 1 complied and sent three personal checks and two cashier's checks to Onwumere and Abdalkareem. The money Victim 1 sent was his life savings. He even had to obtain a loan secured by his used pick-up truck for the last payment. The entire time conspirators were impersonating federal law enforcement officials, they continued impersonating Celebrity 1, who was encouraging Victim 1 to comply with demands for payment.

p)      The law enforcement con began on September 25, 2023. On that date, a conspirator in Nigeria used the email address <u>unitedstates.fbi283738@gmail.com</u> to impersonate the

8

Director of the FBI at the time, Christopher Wray. The email used the actual name of Director Wray, a real person. The conspirator advised Victim 1 of an ongoing investigation regarding Celebrity 1 and advised that Celebrity 1 had reported inappropriate behavior and harassment by Victim 1. The email advised Victim 1 of his rights to remain silent and to have counsel.

q)      The next day, a conspirator in Nigeria sent Victim 1 a second email purporting to be from the Director of the FBI. This one noted Victim 1's lack of response to the first email and threatened that failure to respond could result in legal consequences. It also warned that attempts to hinder or obstruct the investigation would result in further legal ramifications.

r)      On October 2, 2023, Victim 1 read and responded to these emails. Victim 1 explained that he had just received the emails, did not check the account often, and described the romantic relationship he had with Celebrity 1. In response, a conspirator advised Victim 1 that it took him too long to reply, so he had been charged a mandatory fee of $1,500. The conspirator also warned that the next time a reply took so long, the fee would be higher. The conspirator explained that the "complaint has been lodged by the official management of [Celebrity 1], which adds a level of seriousness to the matter." In response, Victim 1 explained, "I've been texting with [Celebrity 1], and she told her management team she sent me some nude pictures of her. They told her they were afraid I would put them online so the public could see them. That's why they filled the sexual complaint. I assured her that no one else saw the pictures and that I had deleted them. Ask her and she will tell you. I never use Google mail, that's why I didn't respond. Will gladly pay the fine. Sorry for the delay."

s)      A conspirator, still using the sham FBI email account, then instructed Victim 1 to pay $1,500 in cryptocurrency. When Victim 1 explained that he did not know how, a conspirator advised, "Due to inability to pay in cryptocurrency, your charge would be expatiated and

9

you're going to get a $5,500 check to us. When're you writing the check so I can get the information of who and where you're sending it to. Failure to make this payment within 24 hours will lead to some drastic consequences from the company thank you."

### *Initial Checks From Victim 1*

t)      Shortly after the imposter FBI email advised Victim 1 that he now owed $5,500, a conspirator using the sham FBI email sent Victim 1 a message that read, "You're requested to send a personal check to this address on the card." The below image of a card was included, with Abdalkareem identified as an Accountant Agent, and Onwumere's and Abdalkareem's address listed.



u)      Victim 1 had been a long-term customer of Beacon Financial Credit Union ("BFCU") in Johnson City, Tennessee. In response to the initial demands, he issued three personal checks and mailed them by either regular or registered mail to Onwumere and Abdalkareem. The checks were identified as check number 2515 dated October 4, 2023, in the amount of $5,500 originally made payable to the FBI; check number 2516 in the amount of $4,500 made payable to Salmasam LLC; and check number 2517 in the amount of $5,500 made payable to the FBI. Evidence that these checks were mailed to Onwumere and Abdalkareem includes a recovered, post-

10

marked envelope from their residence as well as United States Postal tracking information showing a delivery to their residence on October 6.

v) When Onwumere received check number 2517, Onwumere realized that the check was payable to the FBI, so he tore up the check, placed the pieces on a blanket in his home, took a digital photo, and sent the photo to Coconspirator 1 in Nigeria.

w) Regarding check number 2515 payable to the FBI, Onwumere and Abdalkareem, aided and abetted by each other, attempted to change the payee information on this check so that instead of reading, "FBI" as originally written by Victim 1, the payee was altered to read, "FBED Salma Abdalkareem." Abdalkareem then deposited this check into the Wells Fargo account at a Wells Fargo ATM in Sumerset, New Jersey on October 14, 2023. Wells Fargo returned the item due to the alteration. During a subsequent call with a Well's Fargo financial investigator, Abdalkareem advised that she had done prior business with Victim 1, had booked a travel package for him, and spoke with Victim 1 after the check was rejected. She advised that Victim 1 would be issuing a new check.

x) Regarding check number 2516, this check was endorsed by Onwumere and deposited into the TD Bank account on October 10, 2023, in Sumerset, New Jersey.

*Additional Cashier's Checks*

y) After Victim 1 sent checks payable to the FBI, conspirators in Nigeria then used that fact to extort more money from him. In that regard, a conspirator sent another sham email, purporting to be from the Attorney General of the United States, with the following notice:

11



**Warning Notice!!!**

THE DIRECTOR, FEDERAL BUREAU OF INVESTIGATION
935 PENNSYLVANIA AVE., NW., WASHINGTON, DO
20535-0001

Rd Johnson City TN
37604-7626
6th October, 2023.

OFFICIAL CONTACT REGARDING ONGOING INVESTIGATION (ALLEGED CASE OF SEXUAL HARASSMENT)

M███████, you where instructed to make a payment to an agent whose information (name, address and phone number) was provided correctly. You made a mistake by writing the check to the order of the FBI. We're trying to resolve this case without anyone knowing about it. you paid for the fee cost, but you just exposed everything and now we need to cover up for it immediately respond to this letter asap so I'll tell you the next step.

z)      An email from the sham FBI account also sent the photograph of the torn-up check Onwumere had created along with message: "THE CHECKS WERE BOTH DESTROYED TO HELP KEEP YOUR NAME OUT OF THE CASE AND WE ONLY DID THIS TO PROTECT YOUR PRIVACY AND YOU HAVE PAID SOME FEES TOO SO YOU EARNED OUR TRUST AT SOME POINT BUT...NOTE: SENDING A CHECK WITH THE FBI ON CAN EASILY EXPOSE YOU BECAUSE BANKS MIGHT GET CURIOUS AND WANT TO DIG IN AND YOU DO NO WANT THE MASSES AND THE MEDIA OUT THERE TO START DIGGING INTO THIS CASE. YOU HAVE IMPOSED A CHARGE ON YOUR FEES FOR DISOBEYING THE DIRECTOR's ORDER. YOU WERE SUPPOSED TO FILL THE CORRECT INFORMATION BUT YOU DIDN'T WHICH HAS LET TO A DELAY IN PAYMENT SO AN ORDER WAS PASSED THAT YOU'RE MANDATED BY THE SUPREME COURT TO PAY

12

$40,000. LET ME KNOW WHEN TO SEND THE INFORMATION FOR YOU TO MAIL OUT A CASHIER CHECK. THIS TIME NO MISTAKES AND NO DELAYS SEND AS EXPRESS SO IT'LL GET TO THE DESTINATION REAL FAST (a day or two)." [Capitalized in original].

aa) Victim 1 complied with the demand to send more money, and on October 5, 2023, he obtained cashier's check number 41882 from BFCU in the amount of $41,000. The check was payable to Onwumere. A banker at BFCU recalled that Victim 1 wanted the check for $41,000.00 and provided Onwumere's name and an address on Victim 1's phone. The banker also recalled the victim acting nervous, which was very unusual because Victim 1 was generally upbeat and happy. After obtaining the check payable to Onwumere, Victim 1 then mailed the check to an associate of Onwumere in Maryland.

bb) Onwumere retrieved the cashier's check at the address of his associate in Maryland. On October 8, 2023, Onwumere endorsed the check and deposited the funds into a TD Bank ATM machine in Maryland. Onwumere's associate was present when he did so and witnessed the entire transaction.

cc) After Victim 1 obtained the first cashier's check, a conspirator in Nigeria then used the sham FBI email account to advise Victim 1 that he would need to pay an additional $40,000. On October 6, 2023, the coconspirator emailed, "THE ATTORNEY's $41,000 GOES TO CLOSING YOUR CASE FILE THE $40,000. MANDATED BY THE SUPREME COURT SEALS ALL EVIDENCE AND WHATEVER THAT WAS AGAINST YOU WILL BE NULL AND VOID. THIS PAYMENT IS VERY IMPORTANT UNLESS YOU'RE READY TO APPEAR IN COURT WITH YOUR ENTIRE FAMILY TO DEFEND YOURSELF IN FRONT OF THE WORLD." Victim 1 agreed to these terms, but he advised that he needed to obtain a loan to make the full second payment. Later, a coconspirator impersonating the FBI emailed, "How much time

13

do you need to get a loan and all that process will only delay your case leading to more charges and fines so I'd suggest you pay what you can while you work on the loan that way the process is in constant motion and slow and steady always wins the race."

dd)    On October 6, 2023, Victim 1 advised a coconspirator he thought was an FBI official that he was at the bank to get the additional funds. During the ensuing email conversations, Victim 1 advised that he was going to have to get a loan to make up the total payment. A conspirator in Nigeria told Victim 1, "Do that responsibly and try to keep this whole case protected and safe no one must find out or everything might blow up and the entire world not just your wife will learn about everything and that won't still stop the charges so be smart." The conspirator also advised that "when you're ready to send let me know and I'll get the information available remember it must be a cashier check like the 41,000 and you should fill the individual information on the check it shouldn't be anyways related to FBI and the memo could be your name or could be for family to keep your tracks hidden and untraceable any slight error will cause attention be careful keep this a solid secret until we're done work closing your case file." The coconspirator then advised Victim 1 to make the cashier's check payable to Abdalkareem and send it to Onwumere's and Abdalkareem's home address in New Jersey. Victim 1 complied and obtained BFCU Cashier's check number 41889 in the amount of $41,000. The funds represented the remainder of Victim 1's life savings as well as the proceeds from a new loan he obtained with his truck as security.

ee)    Victim 1 then mailed the second check for $41,000 to Onwumere and Abdalkareem at their residence in New Jersey. On October 8, 2023, Abdalkareem endorsed the check and deposited the check into the NFCU account. Bank surveillance footage captured Onwumere and Abdalkareem making the deposit:

14

*SA*



*Evidence of Conspirators' Harassment and Intimidation of Victim 1*

ff)     Defendant, Onwumere, and Abdalkareem did not participate in direct communications with Victim 1. Other conspirators in Nigeria engaged in those communications. The communications were designed to harass and intimidate Victim 1 and to cause him substantial emotional distress.

gg)     Examples of harassing and intimidating communications included the following:

- Communications routinely purported to be from high-ranking federal officials such as the Director of the FBI and the Attorney General of the United States and often contained seals and logos of those federal agencies.

- On October 3, 2023, after Victim 1 advised he sent the first check by regular mail, a conspirator using the FBI account emailed, "What courier company has no tracking number? Get a tracking number as prove of your payment immediately!!!"

15

- Later, on October 3, a conspirator emailed, "Sending checks is similar to sending letters you must have a tracking number to prove you sent the payment or it's null and void secondly you can't take pictures but you sent [Celebrity 1] your nudes how did you do that? You better have this tracking number generated by the post or mail office otherwise consider the payment not valid and you have 5 hours to rectify that issue and send me a tracking number I'll be back in 5 hours if I don't hear from you."

- Later on October 3, after Victim 1 asked who he thought was the FBI to speak with Celebrity 1, a conspirator emailed, "I have no business in texting [Celebrity 1] you're the suspect [sic] you're my focal point." A follow-up email advised Victim 1, "No one is afraid like you are […] they reported the case and you're the major suspect you should be afraid if you aren't already you're in big big trouble if you don't listen to what I'm telling you."

- On October 12, 2023, a conspirator in Nigeria posing as the FBI emailed, "If you ever ignore a message from us for 10 hours you'll pay $1,000 per hour until you respond!!!"

- Later on October 12, a conspirator in Nigeria emailed, "You just said fake charges? Do you realize who you're referring to? I wouldn't want to relay that message to the headquarters otherwise you'll forever regret it! I will warn you for the last time beware of your utterances and the sentences you compose if you don't want to be prosecuted."

16

hh)     The repeated harassing and intimidating emails sent to Victim 1 caused him substantial emotional distress. Although defendant, Onwumere, and Abdalkareem were not parties to these communications, other conspirators clearly were aware that the stress from the law enforcement scam was making Victim 1 suicidal. For instance, on October 2, 2023, after Victim 1 informed the imposter Celebrity 1 about the FBI emails, the imposter Celebrity 1 messaged him and said, "Stop saying you will kill yourself."

ii)     In another message on October 2, 2023, a conspirator impersonating Celebrity 1 messaged Victim 1, "I'll let the FBI do their job [sic] good luck killing yourself but remember you'll roast in hell for suicide." In a similar message on October 7, 2023, a conspirator impersonating Celebrity 1 messaged, "Swear to me you ain't ever going to kill yourself and I'll show you a nipple."

jj)     On October 10, 2023, a conspirator impersonating Celebrity 1 sent Victim 1 a message that contained a photo of a purported suicide note. The note indicated that Celebrity 1 was committing suicide because the man she loved had killed himself, and Celebrity 1 could not live without him, so Celebrity 1 would be joining him in the world beyond. The note concluded, "Sorry fans."

### The Hospital Scam

kk)     After obtaining the victim's life savings, one or more conspirators in Nigeria then began a new phase of the scam. On October 14, 2023, a conspirator in Nigeria impersonating Celebrity 1 messaged Victim 1 and advised that she was now in the hospital. The message advised that her doctor indicated she was stressed due to "overwhelming thoughts and emotions" related to

17

Victim 1 threatening to kill himself. The same day, the imposter Celebrity 1 sent another message that referenced people finding the note described in paragraph 4. jj), above.

ll)     On October 22, 2023, a conspirator in Nigeria, impersonating the Attorney General of the United States, sent Victim 1 the following email:





### Victim 1's Resulting Death

mm)     On October 22, 2023, after receiving the sham email from a conspirator purporting to be the Attorney General of the United States, Victim 1 messaged a conspirator impersonating Celebrity 1 the following:

Oct 22, 11:41 PM

Another text, demanding I pay for your hospital bills. Can't happen I have no money, by love.

I probably won't wait to hear from the hospital or FBI. Tired of this crap. Please accept me God and forgive me.

nn)     The next morning, on October 23, 2023, Victim 1 sent the following message to a conspirator impersonating Celebrity 1:

18

FBI and lawyers are after me again. So my wife will have to pay their fines, my bills, my car, my funeral and your hospital bills. I'm deleting chat and hiding my phone. On my way to end this

oo) On October 23, 2023, an Officer with the Washington County Sheriff's Office responded to the ATV trail parking lot located at 1519 Dry Creek Road in Jonesborough, TN. Victim 1 was located inside his blue pick-up truck. The Officer investigated and discovered Victim 1 was sitting in the driver seat, covered by a jacket, with a revolver in his lap. Victim 1 was dead, and subsequent autopsy by a Medical Examiner in Johnson City determined that the cause of death was a gunshot wound to the head and the manner of death was suicide.

pp) A warranted search of Onwumere and Abdalkareem's home revealed an envelope from Victim 1 and the blanket that served as the background for the photo Onwumere had taken of the torn-up check payable to the FBI. That search and subsequent review of bank accounts and warranted searches of involved email accounts revealed that defendant, Onwumere, and Abdalkareem had laundered funds from other victims of romance scams and law enforcement scams around the country.

### Evidence of Defendant's Role in the Conspiracy

qq) Apart from initially recruiting Onwumere to participate in laundering funds for the conspiracy, defendant played an active role in the conspiracy, including defrauding Victim 1 of his money.

rr) For instance, in a Whatsapp communication between Conspirator 1 (defendant's relative in Nigeria) and Onwumere, Coconspirator 1 sent a screenshot of a conversation with defendant that identified Victim 1, listed the names of Onwumere and Abdalkareem, and included their bank names as "Federal navy" and "TD Bank."

19

ss) Defendant also actively participated in aiding Coconspirator 1 launder funds obtained from Victim 1 and others. One means the conspirators used to do this was through Cashapp transactions, including transactions with defendant and with Person 1. In a communication between Coconspirator 1 and Abdalkareem, Coconspirator 1 provided Abdalkareem with the Cashapp IDs of defendant and Person 1. Person 1 is a female who resides in Nashville, Tennessee. Coconspirator 1 had convinced Person 1 that he was a government contractor who was located overseas, and defendant was an associate in the United States Army. During the conspiracy, Person 1 received multiple transfers of funds through Cash App from Abdalkareem and Onwumere. CashApp records for Person 1's CashApp account show that she transferred $33,430 to defendant, thinking these were related to Coconspirator 1's phony government business and expenses.

tt) Another victim, identified as Victim 2 in the indictment, also fell prey to the romance scheme that coconspirators were perpetrating. Victim 2 was an elderly man who resided in the state of Arizona. Like Victim 1, Victim 2 thought that he was engaged in a romantic relationship with Celebrity 1 due to electronic messaging. At one point, a conspirator purporting to be Celebrity 1 convinced Victim 2 to send a cashier's check to Abdalkareem in the sum of $11,850 to facilitate the shipment of a luxury vehicle. Coconspirator 1 sent Onwumere a screen shot of a WhatsApp conversation he had with defendant that included photos of the cashier's check Victim 2 had obtained that was payable to Abdalkareem.

uu) Coconspirators in Nigeria also engaged in a similar hospital scam with Victim 2 like they had done with Victim 1. Scammers sent Victim 2 several emails purporting to be from a hospital in the state of Virginia that described that Celebrity 1 was purportedly being treated in the hospital. Coconspirators also sent Victim 2 the same photograph purportedly depicting Celebrity 1 in the hospital as the photograph they had sent to Victim 1. In emails to Victim 2, they advised that

20

in order to clear up Celebrity 1's hospital bill, Victim 2 needed to send a cashier's check payable to defendant and provided defendant's address in the state of Washington.

vv)     Victim 2 followed the instructions provided by the scammers and obtained a cashier's check from his financial institution in the amount of $22,500 that was payable to defendant. Victim 2 then sent the cashier's check to defendant. Defendant, upon receipt of Victim 2's cashier's check, made an ATM deposit of the check into his Armed Forces bank account on November 4, 2023.

ww)     Agents arrested defendant in the state of Washington upon his return from a trip to Nigeria. At the time, defendant had a mobile phone on his person. On August 5, 2024, agents obtained a federal search warrant to search defendant's phone. Upon executing that search warrant, a forensic search of the device revealed numerous WhatsApp messages between defendant and Coconspirator 1. Review of the messages showed that defendant was routinely making Amazon purchases for things like flowers and candy to be delivered to additional victims of romance scams the conspiracy had targeted. The review also showed numerous instances in which defendant was laundering proceeds from victims of romance scams through various money transfer applications. The review also disclosed photographs of items defendant had mailed in furtherance of the conspiracy.

5.     The defendant is pleading guilty because the defendant is in fact guilty. The defendant understands that, by pleading guilty, the defendant is giving up several rights, including:

a)     the right to plead not guilty;

b)     the right to a speedy and public trial by jury;

c)     the right to assistance of counsel at trial;

21

d)      the right to be presumed innocent and to have the burden of proof placed on the United States to prove the defendant guilty beyond a reasonable doubt;

e)      the right to confront and cross-examine witnesses against the defendant;

f)      the right to testify on one's own behalf, to present evidence in opposition to the charges, and to compel the attendance of witnesses; and

g)      the right not to testify and to have that choice not used against the defendant.

6.      The parties agree that the appropriate disposition of this case would be the following as to each count:

a)      The Court may impose any lawful terms of imprisonment, any lawful fines, and any lawful terms of supervised release up to the statutory maximums;

b)      The Court will impose special assessment fees as required by law; and

c)      The Court may order forfeiture as applicable and restitution as appropriate.

d)      Pursuant to Rule 11(c)(1)(B), the parties agree to jointly recommend to the Court that the following provisions of the sentencing guidelines should or should not apply: (1) the specific offense characteristic of loss that was more than $250,000 but not more than $550.00 *shall apply* under U.S.S.G. § 2B1.1(b)(1)(H), and the United States agrees that it will not recommend a further loss enhancement under U.S.S.G. § 2B1.1(b)(1); the specific offense characteristic of an offense that involved 10 or more victims *shall apply* under U.S.S.G. § 2B1.1(b)(2); if the Court determines that an aggravating role is appropriate under U.S.S.G. § 3B1.1, the aggravating role enhancement that *shall apply* will be the enhancement set forth in U.S.S.G. § 3B1.1(c), and the United States will not recommend any further role enhancement under U.S.S.G. § 3B1.1 (this recommendation shall not limit defendant's ability to argue that no aggravating role enhancement should apply and shall only be applicable if the Court determines otherwise). The parties agree that

22

these guideline recommendations are not binding on the Court, and if the Court declines to follow the joint guideline recommendations, the defendant's guilty plea will stand. The parties further agree that additional specific offense characteristics or enhancements may be included in the Presentence Investigation Report, and either party shall be free to advocate for or against them, and if the Presentence Investigation Report recommends that additional provisions of the guidelines apply, the parties shall be free to advocate for or against the application of those provisions at sentencing. Also, regardless of the parties' joint guideline recommendations, the parties shall be free to argue any underlying facts that may have been offered in support of any guideline provision as relevant for purpose of determining an appropriate sentence under 18 U.S.C. § 3553(a), and the United States shall be free to defend any lawful sentence imposed by the Court if defendant pursues any appeal permitted under this plea agreement.

e) No promises have been made by any representative of the United States to the defendant as to what the sentence will be in this case. Any estimates or predictions made to the defendant by defense counsel or any other person regarding any potential sentence in this case are not binding on the Court and may not be used as a basis to rescind this plea agreement or withdraw the defendant's guilty pleas. The defendant understands that the sentence in this case will be determined by the Court after it receives the presentence investigation report from the United States Probation Office and any information presented by the parties. The defendant acknowledges that the sentencing determination will be based upon the entire scope of the defendant's criminal conduct, the defendant's criminal history, and pursuant to other factors and guidelines as set forth in the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553.

7. Given the defendant's agreement to plead guilty, the United States will not oppose a two-level reduction for acceptance of responsibility under the provisions of Section 3E1.1(a) of the

23

Sentencing Guidelines. Further, if the defendant's offense level is 16 or greater, and the defendant is awarded the two-level reduction pursuant to Section 3E1.1(a), the United States agrees to move, at or before the time of sentencing, the Court to decrease the offense level by one additional level pursuant to Section 3E1.1(b) of the Sentencing Guidelines. Should the defendant engage in any conduct or make any statements that are inconsistent with accepting responsibility for the defendant's offenses, including violations of conditions of release or the commission of any additional offenses prior to sentencing, the United States will be free to decline to make such motion, to withdraw that motion if already made, and to recommend to the Court that the defendant not receive any reduction for acceptance of responsibility under Section 3E1.1 of the Sentencing Guidelines.

8.      The defendant agrees to pay the special assessments in this case prior to sentencing.

9.      Unless otherwise limited by an agreed preliminary order of forfeiture, the defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, which are in the possession or control of the defendant or the defendant's nominees that constitute or are derived from proceeds traceable to an offense in violation of 18 U.S.C. §§ 1341, 1343 and/or 1349.

The defendant agrees to forfeit the defendant's interest in the following property:

> A money judgment representing the proceeds the defendant,
> STEPHEN O. ANAGOR, personally obtained from the conspiracy to
> commit mail and wire fraud.

The defendant further agrees to assist the United States fully in the identification, recovery, and return to the United States of any other assets or portions thereof subject to forfeiture. The defendant further agrees to make a full and complete disclosure of all assets over which the defendant exercises control and those which are held or controlled by a nominee. The defendant

24

agrees to forfeit all interests in the properties as described above and to take whatever steps are necessary to pass clear title to the United States. These steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and the signing of any other documents necessary to effectuate such transfers. The defendant agrees not to object to any administrative, civil or criminal forfeiture brought against any property seized or in custody of law enforcement during the investigation. The defendant agrees to take all such steps to locate such property and to pass title to the United States before the defendant's sentencing.

In the event a money judgment forfeiture is ordered, the defendant agrees to send all money judgment payments to the United States Treasury Department. The defendant also agrees that the full money judgment amount shall be considered due and payable immediately. If the defendant cannot pay the full amount immediately and is placed in custody, the defendant agrees that the Bureau of Prisons will have the authority to establish payment schedules to ensure payment of the money judgment. The defendant further agrees to cooperate fully in efforts to collect on the money judgment by set-off of federal payments, execution on non-exempt property, and any other means the United States deems appropriate. The defendant and counsel also agree that the defendant may be contacted post-judgment regarding the collection of the money judgment without notifying defendant's counsel and outside the presence of the defendant's counsel.

10. The defendant agrees that the Court shall order restitution, pursuant to any applicable provision of law, for any loss caused to: (1) the victims of any offense charged in this case (including dismissed counts); and (2) the victims of any criminal activity that was part of the same course of conduct or common scheme or plan as the defendant's *charged* offenses. The defendant agrees, pursuant to 18 U.S.C. § 3663(a)(3), that the order of restitution will include payment of the amount of $86,500 to Recipient 1, the victim's surviving spouse, whose full identity shall be

25

provided to the Clerk of the Court. The defendant further agrees that any loss limitation recommended under paragraph 6, above, shall have no effect on the amount of restitution ordered to any victims of any offense charged in the superseding indictment.

11.     Financial Obligations. The defendant agrees to pay all fines and/or restitution to the Clerk of Court. The defendant also agrees that the full fine and/or restitution amount(s) shall be considered due and payable immediately. If the defendant cannot pay the full amount immediately and is placed in custody or under the supervision of the Probation Office at any time, the defendant agrees that the Bureau of Prisons and the Probation Office will have the authority to establish payment schedules to ensure payment of the fine and/or restitution. The defendant further agrees to cooperate fully in efforts to collect any financial obligation imposed by the Court by set-off of federal payments, execution on non-exempt property, and any other means the United States deems appropriate. The defendant and counsel also agree that the defendant may be contacted post-judgment regarding the collection of any financial obligation imposed by the Court without notifying the defendant's counsel and outside the presence of the defendant's counsel. In order to facilitate the collection of financial obligations to be imposed with this prosecution, the defendant agrees to disclose fully all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party. In furtherance of this agreement, the defendant additionally agrees to the following specific terms and conditions:

a)     If so requested by the United States, the defendant will promptly submit a completed financial statement to the U.S. Attorney's Office, in a form it provides and as it directs. The defendant promises that such financial statement and disclosures will be complete, accurate, and truthful.

26

b) The defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

c) If so requested by the United States, the defendant will promptly execute authorizations on forms provided by the U.S. Attorney's Office to permit the U.S. Attorney's Office to obtain financial and tax records of the defendant.

12. The defendant voluntarily, knowingly, and intentionally agrees to the following:

a) The defendant will not file a direct appeal of the defendant's convictions or sentence with one exception: The defendant retains the right to appeal a sentence imposed above the sentencing guideline range determined by the Court or above any mandatory minimum sentence deemed applicable by the Court, whichever is greater. The defendant also waives the right to appeal the Court's determination as to whether the defendant's sentence will be consecutive or partially concurrent to any other sentence.

b) The defendant will not file any motions or pleadings pursuant to 28 U.S.C. § 2255 or otherwise collaterally attack the defendant's conviction(s) or sentence, with two exceptions: The defendant retains the right to file a § 2255 motion as to (i) prosecutorial misconduct and (ii) ineffective assistance of counsel.

c) The defendant will not, whether directly or by a representative, request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. Section 552, or the Privacy Act of 1974, 5 U.S.C. Section 552a.

27

13. The defendant is a naturalized United States citizen. The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States or if the United States commences subsequent denaturalization proceedings against the defendant. Under federal law, a broad range of crimes are removable offenses, including the offenses to which the defendant is pleading guilty. The defendant is pleading guilty to offenses that involve moral turpitude, a conspiracy to commit mail and wire fraud with losses exceeding $10,000, aggravated stalking, and aggravated identity theft, all of which are felonies. Those offenses are considered deportable offenses with removal being presumptively mandatory for a permanent resident or an unlawful alien. Denaturalization, removal, and other immigration consequences are the subject of separate proceedings, however, and the defendant understands that no one, including his attorney, the prosecuting attorney, or the Court, can predict to a certainty the effect of the defendant's conviction on immigration status. The defendant nevertheless affirms that the defendant wants to plead guilty regardless of any immigration consequences the plea may entail, even if the consequence is automatic removal from the United States should denaturalization proceedings take place.

14. This plea agreement becomes effective once it is signed by the parties and is not contingent on the defendant's entry of a guilty plea. If the United States violates the terms of this plea agreement, the defendant will have the right to withdraw from this agreement. If the defendant violates the terms of this plea agreement in any way (including but not limited to failing to enter guilty pleas as agreed herein, moving to withdraw guilty pleas after entry, or by violating any court order or any local, state or federal law pending the resolution of this case), then the United States will have the right to void any or all parts of the agreement and may also enforce whatever parts of the agreement it chooses. In addition, the United States may prosecute the defendant for any and all

28

federal crimes that the defendant committed related to this case, including any charges that were dismissed and any other charges which the United States agreed not to pursue. The defendant expressly waives any statute of limitations defense and any constitutional or speedy trial or double jeopardy defense to such a prosecution. The defendant also understands that a violation of this plea agreement by the defendant does not entitle the defendant to withdraw the defendant's guilty pleas in this case.

15. The United States will file a supplement in this case, as required in every case by the Local Rules of the United States District Court for the Eastern District of Tennessee, even though there may or may not be any additional terms. If additional terms are included in the supplement, they are hereby fully incorporated herein.

16. This plea agreement and supplement constitute the full and complete agreement and understanding between the parties concerning the defendant's guilty plea to the above-referenced charges, and there are no other agreements, promises, undertakings, or understandings between the defendant and the United States. The parties understand and agree that the terms of this plea agreement can be modified only in writing signed by all of the parties and that any and all other promises, representations, and statements whether made before, contemporaneous with, or after this

29

agreement, are null and void.

_____  
6/11/25  
Date

By:

FRANCIS M. HAMILTON III  
UNITED STATES ATTORNEY

_____  
Mac D. Heavener, III  
Assistant United States Attorney

_____  
06-09-2025  
Date

_____  
Stephen O. Anagor  
Defendant

_____  
6/9/25  
Date

_____  
Charles L. Bledsoe  
Attorney for the Defendant

30