UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | 2:24-CR-00019-DCLC-CRW |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEPHEN O. ANAGOR, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the United States' Amended Objections to the

Presentence Report [Doc. 93]. At the November 19, 2025 hearing, the Court heard arguments

from the parties on the objections. This matter is now ripe for consideration.

I. **Background**

On July 9, 2024, a federal grand jury returned a thirty-eight count superseding indictment

charging Anagor and his coconspirators Chinagorom Onwumere and Salma Abdalkareem with

numerous offenses for their role in an international romance scam. The scam resulted in the loss

of nearly $400,000 from at least eight victims,[1] one of whom committed suicide as a result. [Doc.

30]. On June 11, 2025, Anagor entered into a Plea Agreement whereby he pled guilty to Count 2

(Conspiracy to Commit Mail and Wire Fraud), Count 4 (Aiding and Abetting Aggravated Stalking

Resulting in Death), and Count 36 (Aiding and Abetting Aggravated Identity Theft). [Doc. 62].

---

[1] This number is the total restitution owed to the victims and is not the individual loss amount
attributed to Anagor.

In the Plea Agreement, Anagor admitted to the following facts describing how the scam operated and his role within it. Anagor was a member of the United States Army, and during basic training, he met and befriended codefendant Onwumere. Anagor shared with him a way to make money: Anagor's relative in Nigeria, identified as Coconspirator 1, made people "fall in love" on the computer and obtained money from them. For a cut of that money, individuals in the United States with domestic bank accounts received and laundered checks the victims mailed to them. Onwumere agreed to launder funds through accounts owned by him and his wife, codefendant Abdalkareem.

Anagor did not know the specifics of how and when Coconspirator 1 and others were communicating with victims; however, he did know the funds he was depositing were the proceeds of fraudulent activity. When he received checks from the victims of the scam, he deposited the funds into his bank accounts, kept a portion, and sent electronic transfers of the remainder to other accounts and individuals. Anagor also purchased flowers and other gifts to be delivered to the victims of the scams that Coconspirator 1 was orchestrating.

Victim 1 was a retired teacher from Jonesborough, Tennessee who fell victim to the romance scam and believed he was in a relationship with a celebrity. As part of the scam, coconspirators in Nigeria sent Victim 1 nude photos, purporting to be the celebrity. A few weeks after sending the photos, the scammers then impersonated high-level federal law enforcement officials claiming that the photos leaked to the public and that Victim 1 was the prime suspect. The scammers harassed and threatened Victim 1 with criminal action if he did not pay a series of fines. Neither Anagor nor his codefendants knew these communications were occurring. On October 4, 2023, Victim 1 mailed Abdalkareem and Onwumere three personal checks. These checks were identified as check number 2515, made payable to the FBI and with the memo line reading "Agent

Salma Abdalkareem," in the amount of $5,500; check number 2516 for $4,500 made payable to Salmasam LLC, a business owned by Abdalkareem; and check number 2517, again made payable to the FBI for $5,500. They received these checks via the mail at their residence, and an envelope from Victim 1 addressed to the FBI's Department of Payments/Fees was found at their home. Abdalkareem and Onwumere altered check number 2515, changing the payee from "FBI" to "FBED Salma Abdalkareem." Abdalkareem attempted to deposit the check, but the bank denied it due to the alteration. During a later call with the bank, Abdalkareem lied to the financial investigator, telling him that she had done business with Victim 1, had booked a travel package for him, and that he would be issuing a new check. Onwumere endorsed and deposited check number 2516 and tore up check number 2517 after realizing it was made payable to the FBI. Onwumere then sent a photo of the torn-up check to Coconspirator 1.

The coconspirators in Nigeria continued to threaten Victim 1. Purporting to be the Attorney General of the United States, they claimed the Supreme Court ordered Victim 1 to pay tens of thousands of dollars or else he would need to testify in front of his family and the world about the nude photos and his affair with the celebrity. The day after Victim 1 issued the three personal checks, he obtained a cashier's check for $41,000, made payable to Onwumere. The day after that, he obtained a second cashier's check, also for $41,000 but payable to Abdalkareem. This money was Victim 1's life savings. Onwumere deposited the first check, and Abdalkareem endorsed and deposited the second. The scammers relentlessly continued to demand more and more money from Victim 1. Just over two weeks after issuing these checks, Victim 1 sent two suicidal messages to the Nigerian coconspirators, believing it to be the celebrity he was in a romantic relationship with. And on October 23, 2023, he committed suicide.

Although Anagor did not directly participate in the scheme against Victim 1, he was aware that the victim was being targeted, and that Onwumere and Abdalkareem were involved in depositing and laundering his money. In a Whatsapp communication between Coconspirator 1 and Onwumere, Coconspirator 1 sent a screenshot of a conversation with Anagor that identified Victim 1, listed the names of Onwumere and Abdalkareem, and included their bank names. Further, Anagor personally benefited from the scheme against Victim 1. During the conspiracy, Anagor received $33,430, transferred via Person 1, another scammed individual, who received the money from Abdalkareem and Onwumere.

Victim 1 was one of many victims of this scam. Anagor personally received $22,500 from Victim 2, and other victims sent money and gift cards to other individuals in the United States. In total, the Government seeks $388,500 in restitution for the identified victims.

On October 2, 2025, the Probation Officer issued the Presentence Investigation Report (PSR), to which the Government raised multiple objections. The Court will address each objection in turn.

## II.    Legal Standard

Under Federal Rule of Criminal Procedure 32(i)(3)(B), after a party files objections to the PSR, the Court must either rule on the disputed portions of the PSR or determine that a ruling is unnecessary either because the matter will not affect sentencing or because the Court will not consider the matter in sentencing. Fed. R. Crim. P. 32(i)(3)(B). The sentencing court's factual findings "help to ensure that defendants are sentenced on the basis of accurate information and provide a clear record for appellate courts, prison officials, and administrative agencies who may later be involved in the case." *United States v. Monus*, 128 F.3d 376, 396 (6th Cir. 1997) (internal

quotation marks and alterations omitted). The Court must make factual findings by a preponderance of the evidence. *United States v. White*, 492 F.3d 380, 416 (6th Cir. 2007).

## III. The Government's Objections

### A. Objection One (Means of Identification Enhancement)

The United States argues that a two-level increase under U.S.S.G. § 2B1.1(b)(11)(C)(i) for using a means of identification unlawfully to create another means of identification applies to Anagor. As the Court announced during the hearing, this objection is **OVERRULED**, because there is no evidence that Anagor created the fraudulent FBI card, that he agreed to its creation, or that he even knew it existed. Additionally, as the Probation Officer noted in the PSR Addendum, Anagor's offense level has already been enhanced because the offense involved the misrepresentation that he was acting on behalf of a government agency. To apply the § 2B1.1(b)(11)(C)(i) enhancement would constitute impermissible double counting. *See United States v. Duke*, 870 F.3d 397, 404 (6th Cir. 2017) ("Impermissible doubling counting occurs when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways.").

### B. Objection Two (Conscious of Reckless Risk of Death Enhancement)

The Government contends that the two-level enhancement for conscious or reckless risk of death under U.S.S.G. § 2B1.1(b)(16)(A) applies. This guideline applies to fraud offenses, and provides, "If the offense involved … the conscious or reckless risk of death or serious bodily injury… increase [the offense level] by 2 levels." U.S.S.G. § 2B1.1(b)(16)(A).

Of the Circuit Courts that have addressed § 2B1.1(b)(16)(A), a majority require the defendant to have been either subjectively conscious of or objectively reckless as to the existence of the risk created by her conduct. *United States v. Maestas*, 642 F.3d 1315, 1321 (10th Cir. 2011);

*see United States v. Lucien*, 347 F.3d 45, 56-57 (2d Cir. 2003) (for the enhancement to apply, the conduct must have created a risk that others would suffer bodily injury; "moreover, said risk must have either been known to the defendant (conscious), or, if unknown to the defendant, the type of risk that is obvious to a reasonable person and for which disregard of said risk represents a gross deviation from what a reasonable person would do (reckless)"); *United States v. Johansson*, 249 F.3d 848 (9th Cir. 2001) (holding that a defendant does not need to subjectively know that her conduct created a serious bodily risk); *cf. United States v. Silber*, 456 F. App'x 559, 563 (6th Cir. 2012) (describing the other Circuits' approaches but declining to adopt a particular approach).

"A defendant's conduct involves a conscious risk if the defendant was subjectively aware that her conduct created a risk of serious bodily injury, and a defendant's conduct involves a reckless risk if the risk of bodily injury would have been obvious to a reasonable person." *Maestas*, 642 F.3d at 1321. Therefore, a reckless risk requires objectively culpable conduct. *Id.* The Sixth Circuit has held that § 2B1.1(b)(16)(A) requires that the reckless risk be "actual, not conjectural." *United States v. Sosa-Baladron*, 800 F. App'x 313, 330 (6th Cir. 2020) (citing *United States v. Vivit*, 214 F.3d 908, 922 (7th Cir. 2000)). And the focus of the analysis must be on the "actual risk of serious bodily injury, not on whether there were actual injuries." *Id.*

Under § 1B1.3(a)(1)(A), a defendant is responsible for her own acts committed, aided, and abetted. Anagor's acts were simple: he received checks in the mail, deposited them, and transferred the money to her coconspirators, retaining a portion for himself. He also sent flowers and other gifts to some of the victims, and he recruited Onwumere into the scheme. In performing these actions, he had personal knowledge that his coconspirators were performing romance scams, and he knew the money he received was the proceeds from these illegal scams.

Under § 1B1.3(a)(1)(B), Anagor is also responsible for all acts and omissions of others that were within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity. This guideline allows sentencing courts to consider the acts of others that satisfy these requirements, as well as all harms resulting from those acts; however, courts cannot consider the acts of others outside the conspiracy. U.S.S.G. §§ 1B1.3(a)(1)(B), 1B1.3(a)(3).  Here, Anagor agreed to launder money for a romance scam. His coconspirators messages to victims that were romantic in nature, impersonating celebrities, and asking for money in relation to the romantic relationship were within the scope of the jointly undertaken criminal activity, in furtherance of the activity, and were reasonably foreseeable to Anagor. Unlike his codefendants Onwumere and Abdalkareem, however, Anagor had no reason to know that his coconspirators were also engaging in law enforcement scams. Therefore, he cannot be held responsible for the messages by his coconspirators impersonating law enforcement officers and making demands and threats for money under that scheme.

Further, he is not responsible for the acts of Victim 1 in sending suicidal messages to his coconspirators and their subsequent responses.  These messages were not within the scope of the jointly undertaken criminal activity, nor were they reasonably foreseeable to Anagor. He cannot be held responsible for these acts, nor can the Nigerian coconspirators' knowledge of Victim 1's suicidal mentality be transplanted to Anagor.

Upon consideration of both his own acts and those of his coconspirators that he is responsible for under § 1B1.3(a)(1)(B), the enhancement does not apply to Anagor.

First, there is no evidence that Anagor had a subjective awareness that his conduct created a risk of death. The Nigerian coconspirators knew that Victim 1 was suicidal because he sent them messages with suicidal thoughts, but Anagor did not know about these messages. He did not have

conscious knowledge that his offenses led to Victim 1's suicide, nor did he know more broadly that his offenses created the risk of anyone's death.

Second, the Government has not provided sufficient evidence to prove, by a preponderance of the evidence, that he was reckless to the existence of the risk of death. The Government contends that because he pled guilty to Aiding and Abetting Aggravated Stalking Resulting in Death, "little argument exists that this offense did not involve a conscious or reckless risk of death." [Doc. 93, pg. 5]. However, § 2B1.1(b)(16)(A) only applies to *fraud* offenses. *See* § 2B1.1 (this section of the sentencing guidelines applies to the economic offenses of "Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States."). The conduct the Government is seeking to enhance is Anagor's Conspiracy to Commit Mail and Wire Fraud charge, not the Aggravated Stalking charge. There is no doubt that the offense of Aggravated Stalking resulting in death involved a conscious or reckless risk of death, but that is separate offense conduct from the mail and wire fraud offense. The Government cites to *United States v. Cardena-Garcia* in support of its argument; however, in that case, the sentencing enhancement was applied to the same offense that involved a death. 362 F.3d 663, 665-67 (10th Cir. 2004) (applying a similar enhancement when a defendant was charged with transporting aliens unlawfully present in the United States for financial gain resulting in death). Here, there is no evidence that Anagor's acts involved in the commission of Conspiracy to Commit Mail and Wire Fraud created a conscious or reckless risk of death.

The only detail Anagor knew about Victim 1 was his name. He did not know his mental state, how much money he was scammed out of, whether that money stolen from him was his life

savings or a drop in the bucket to him, or the specific content of the messages he exchanged with the Nigerian coconspirators. A reasonable person in Anagor's place would have no reason to believe, outside of the knowledge that other romance and law enforcement scams have led to victims' suicides, that this scam, and the fraudulent offenses he committed would create an obvious risk of death.

§ 2B1.1(b)(16)(A) has typically been applied when there is a clear and direct link to physical harm resulting from the fraud offenses. *See, e.g., United States v. Chin*, 41 F.4th 16 (1st Cir. 2022) (applying the enhancement to a pharmacist who sold drugs that he knew were contaminated); *United States v. Hernandez*, 606 F. App'x 230 (5th Cir. 2015) (applying the enhancement to a prison guard who falsified reports indicating that safety checks had been performed on an inmate he knew posed a suicide risk); *United States v. Lucien*, 347 F.3d 45 (2d Cir. 2003) (applying the enhancement to a defendant who participated in staged, deliberate car accidents for the insurance proceeds). Unlike those applications, here, the fraud does not obviously pose a risk of death or serious bodily injury. Nothing about this scheme, apart from the suicidal messages that Anagor was unaware of, differentiates this scam from any other romance or law enforcement scam with regards to its risk of death. While other romance and law enforcement scams have led to victims' suicides, there are no facts present here, that Anagor was aware of, that created a particular risk of suicide in this fraud scheme.

That Victim 1 in fact committed suicide is not relevant to the § 2B1.1(b)(16)(A) analysis because, as the Sixth Circuit has stated, the focus is on the risk of death, not that an actual death occurred. *United States v. Sosa-Baladron*, 800 F. App'x 313, 330 (6th Cir. 2020). It is, however, an obvious risk that someone willing to pay $97,500 to federal law enforcement would face mental

and emotional distress, but the enhancement applies when the offense creates a risk of death or serious bodily injury, not when the offense creates a risk of emotional distress.

Anagor's fraud offenses did not create an obvious risk to a reasonable person that his victims would commit suicide or otherwise face death or serious bodily injury. Therefore, the Government's objection is **OVERRULED**.

### C. Objection Three (Guideline Calculations)

The Government objects to the offense level calculation based on its previous two objections. After overruling the objections, the original offense level calculation remains correct.

### D. Objection Four (Additional Grounds for Upward Departure)

The Court will address any variances and grounds for upward (or downward) departure at Anagor's sentencing hearing on December 2, 2025.

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge